United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DR. JAMES M. SWANSON,

        Plaintiff,

      v.

ALZA CORPORATION,

        Defendant.

_____/

No. C 12-4579 PJH

**ORDER CONSTRUING CLAIMS**

Plaintiff Dr. James M. Swanson alleges that he invented what is claimed in three patents that are presently assigned to defendant ALZA Corporation ("ALZA") – U.S. Patent No. 6,930,129 B2 ("the '129 patent"); U.S. Patent No. 8,163,798 B2 ("the '798 patent"); and U.S. Patent No. 6,919,373 B1 ("the '373 patent").  He also asserts that the patents-in-suit are invalid and unenforceable.

ALZA developed and commercialized a prescription drug product known as Concerta® – a once-a-day treatment containing a medication prescribed for the treatment of Attention-Deficit Disorder ("ADD") and Attention-Deficit Hyperactivity Disorder ("ADHD") in children age six and older, adolescents, and adults up to the age of 65.  Concerta® is covered by several patents, including the patents-in-suit.

The '129 patent was issued on August 16, 2005, and the '798 patent was issued on April 24, 2012.  Both patents (referred to herein as "the ALZA patents") are directed towards "Methods and Devices for Providing Prolonged Drug Therapy."  The '129 patent is based on Application No. 09/802,709.  The '798 patent is based on Application No. 10/639,355, which is a continuation of Application No. 09/802,709 (the '129 patent), which

United States District Court

For the Northern District of California

1   in turn is a continuation of Application No. 09/253,317 (the '373 patent, formerly part of this

2   case, but now dismissed).

3        The claimed inventions work by delivering the drug methylphenidate (or "MPH") –

4   the active ingredient in ALZA's Concerta® – via a novel "ascending" release rate, and by

5   producing a novel "substantially ascending" concentration of drug in the patient's blood.

6   The ALZA patents share the same specification and generally describe and claim

7   compositions and methods for once-a-day treatment of ADD/ADHD with MPH.[1]

8        ALZA claims that its scientists conceived of the inventions in the ALZA patents that

9   led to Concerta® in the early 1990s, at which time they conducted a series of studies that

10  showed for the first time that ascending drug release and ascending plasma drug

11  concentrations could provide effective once-daily treatment for ADHD and the related

12  condition, ADD.

13       This once-a-day treatment was an improvement over conventional MPH therapy,

14  which was offered in only two forms at that time – Ritalin®-IR (an immediate release

15  product that required multiple daily MPH doses to achieve symptom control), and Ritalin®-

16  SR (a once-daily sustained release MPH product that was not very effective in symptom

17  control).  The ALZA patents claim the "ascending" features for once-a-day ADD/ADHD

18  treatment.

19       The parties now seek construction of eight disputed terms from the '129 patent and

20  the '798 patent.  ALZA also seeks an order striking some of the evidence submitted in

21  support of Dr. Swanson's responsive claim construction brief on the basis that the evidence

22  was not timely disclosed.

23                              **BACKGROUND**

24       ADD and ADHD are developmental disorders that typically manifest during

25  childhood.  Patients diagnosed with these disorders typically exhibit inappropriate levels of

26  inattention and/or hyperactive-impulsive behavior.  '129 Patent 6:60-7:8.  The medications

27  ─────────────────────

28       [1] All citations to the common specification of the patents will refer to the '129 patent.

2

United States District Court
For the Northern District of California

1  most frequently prescribed for treatment of ADD and ADHD are varieties of stimulants,

2  such as MPH and amphetamines.  Id. 6:61-65.

3      Immediate-release MPH drug products release their drug load rapidly after ingestion.

4  The duration of drug efficacy is brief, typically only two-three hours, with the greatest

5  degree of efficacy coming one-two hours after administration. Because of the short duration

6  of the effect, individuals using the immediate-release form of the drug must take multiple

7  doses throughout the day.  '129 Patent 2:29-45, 7:14-15.  For children, this means that at

8  least one dose must be administered during the school day, which poses problems such as

9  the need for adult supervision and the possibility of stigmatization.  Id. 7:14-34.  In addition,

10  the rising and falling levels of drug can create a "roller coaster" effect.  Id. 2:7-14.  Based

11  on this need, Ritalin®-SR was developed in the late 1970s, but proved not to be entirely

12  effective.  Id. 7:35-49.

13      ALZA claims that in 1993, it began its efforts to develop an effective once-a-day

14  MPH dosage form, and conducted extensive studies in this pursuit.  Among other things,

15  ALZA compared the effectiveness of three "plasma profiles" – the "saw-tooth" plasma

16  profile represented by the conventional multiple-daily IR dosing, the "flat" plasma profile

17  represented by conventional sustained-release MPH dosage forms, such as Ritalin®-SR,

18  and the "ascending" plasma drug concentration profile, in which the profile substantially

19  ascended during the course of the day.

20      According to ALZA, these studies demonstrated that ALZA's novel, "substantially

21  ascending," plasma drug concentration profile was more effective than the flat plasma drug

22  concentration profile of Ritalin®-SR, and at least as effective as the "saw-tooth" multi-dose

23  IR concentration profile in controlling the symptoms of ADD/ADHD throughout the course of

24  the day.

25      ALZA claims that this discovery ran counter to the then-prevailing wisdom – that a

26  flat drug concentration profile was the preferred approach to delivering drugs via an

27  extended-release formulation, and that the steep rises and falls in blood concentration of

28  MPH that occurred with multiple IR dosing were not required to achieve prolonged

United States District Court

For the Northern District of California

1   effectiveness.  According to ALZA, clinical acceptance of Concerta® has been widespread,

2   and within a year of its introduction into the market, it had obtained 23% of the entire U.S.

3   ADD/ADHD market, and continues to lead the market among long-acting MPH

4   formulations.

5                                    **THE PATENTS**

6          The patents-in-suit describe methods and devices for prolonging the therapeutic

7   effects of MPH for the treatment of ADD/ADHD via a single administration, which typically

8   occurs in the morning.

9          The specification teaches drug release rates and blood plasma profiles[2] that solved

10  the then-existing problems associated with IR and SR MPH dosage forms.  See, e.g., '129

11  Patent 4:10-31, 7:42-8:30, 21:25-22:27.  As described in Example 7, while multiple dosing

12  with IR MPH resulted in "peaks and troughs," the single dose of ALZA's "experimental

13  regimen" resulted in a "substantially ascending plasma drug concentration" and maintained

14  efficacy throughout the 12-hour study period.  See id. 21:63-22:22; see also Fig. 4.

15         Generally, while both patents include the same specification, the '129 patent

16  concerns "methods for treating" ADD/ADHD, while the '798 patent concerns "dosage forms

17  for the treatment of" ADD/ADHD.  That is, the disputed '129 patent claims relate to the

18  discovery that achieving a substantially ascending MPH plasma drug concentration over an

19  extended period of time could provide daylong control of ADD/ADHD symptoms, while the

20  disputed '798 patent claims are directed to oral tablet dosage forms rather than to methods

21  for treating ADD/ADHD.

22         In addition, the '798 patent claims concern the release rate of MPH (or amount of

23  MPH released from the dosage form per unit time), rather than to MPH plasma

24  ─────────────────

25         [2] According to one of ALZA's experts, "drug release rate" refers to the amount of drug
    that is released from a dosage form over time.  Drug release rates are commonly measured
26  by in vitro dissolution, where the dosage form is placed in artificial gastric fluid or other media
    and the amount of drug released into the media is measured over time.  "Plasma drug
27  concentration" is an in vivo measurement and refers to the amount of drug in a person's
    bloodstream. Plasma drug concentration is usually measured over time by performing periodic
28  blood draws after administering the drug.  See Declaration of Kennerly S. Patrick ("Patrick
    Decl.") ¶¶ 15-16.

                                         4

United States District Court

For the Northern District of California

1   concentration, as in the '129 patent.  The two disputed claims in the '798 patent – claim 1

2   and claim 7 – describe dosage forms having immediate-release (IR) and sustained-release

3   (SR) portions, and further specify that the SR portion releases increasing amounts of MPH

4   during sequential one-hour time intervals.

5                                     **DISCUSSION**

6   A.    Legal Standard

7         Patent infringement analysis involves a two-step process.  First, the court must

8   determine as a matter of law the correct scope and meaning of disputed claim terms.

9   Second, the properly construed claims are compared to the accused device to see whether

10  the device contains all the limitations (literally or by equivalents) in the claims at issue.

11  Markman v. Westview Instruments, Inc., 517 U.S. 370, 384 (1996).

12        "[T]he claims of a patent define the invention to which the patentee is entitled the

13  right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation and

14  quotation omitted); see also Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243,

15  1248 (Fed. Cir. 1998) (claim construction "begins and ends" with the actual words of the

16  claims).  The terms used in the claims bear a "heavy presumption" that they mean what

17  they say and have the ordinary meaning that would be attributed to those words by persons

18  skilled in the relevant art.  CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed.

19  Cir. 2002) (citation omitted).

20        A patentee is presumed to have intended the ordinary meaning of a claim term in the

21  absence of an express intent to the contrary.  See York Prods., Inc. v. Central Tractor Farm

22  & Family Ctr., 99 F.3d 1568, 1572 ( Fed. Cir. 1996).  The ordinary and customary meaning

23  of a claim term is " the meaning that the term would have to a person of ordinary skill in the

24  art in question at the time of the invention." Phillips, 415 F.3d at 1313.  The person of

25  ordinary skill in the art is "deemed to read the claim term not only in the context of  the

26  particular claim . . . but in the context of the entire patent, including the specification." Id.

27  The words in the claim may also be interpreted in light of the prosecution history, if in

28  evidence.  Teleflex, Inc. v. Ficosa North Am. Corp., 299 F. 3d 1313, 1324-25 (Fed. Cir.

1

2002) (citations omitted).

"[I]ntrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."  Vitronics Corp. v. Conceptronic, Inc., 90 F. 3d 1576, 1582 (Fed. Cir. 1996).  Only if an analysis of the intrinsic evidence fails to resolve any ambiguity in the claim language may the court then rely on extrinsic evidence, such as expert declarations.  Id. at 1583 ("In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.").

B.      Claim Construction

ALZA contends that because its own proposed constructions are based on the plain and ordinary meaning of the claim terms and the specification's explicit teachings, the court should adopt its constructions.  ALZA also asserts that the constructions proposed by the plaintiff are unsupported, and that they simply refer to "outcome" (efficacy or therapeutic effect) but fail to take into consideration whether the outcome is achieved by the novel once-a-day treatment methods and dosage forms that are described and claimed in the ALZA Patents, or by methods and dosage forms described and practiced in the prior art, namely multiple daily administrations of IR MPH.

'129 Patent

The '129 patent contains two independent claims – claim 1 and claim 2 – which are identical except for the referenced time period.  The first four disputed terms appear in both claim 1 and claim 2 of the '129 patent.

Claim 1 of the '129 patent recites

**[a] method for treating Attention-Deficit Disorder or Attention-Deficit Hyperactivity Disorder in a patient,** wherein the method comprises **administering a pharmaceutically acceptable composition comprising methylphenidate** and a pharmaceutically acceptable carrier to said patient **in a manner that achieves a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration.**

Claim 2 of the '129 patent recites

**[a] method for treating Attention-Deficit Disorder or Attention-Deficit Hyperactivity Disorder in a patient**, wherein the method comprises **administering a pharmaceutically acceptable composition comprising**

6

United States District Court

For the Northern District of California

1
2
3

**methylphenidate** and a pharmaceutically acceptable carrier to said patient **in a manner that achieves a substantially ascending methylphenidate plasma drug concentration over a time period of about 9.5 hours following said administration.**

4          1.      Term 1: "**A method for treating Attention-Deficit Disorder or Attention**

5                  **Deficit Hyperactivity Disorder in a patient**" ('129 Patent, claims 1 and 2)

6          ALZA proposes that this term be construed using its plain and ordinary meaning – "a

7   method for treating ADD or ADHD in an individual."  Plaintiff's proposed construction is

8   "methylphenidate in ADD children who had been receiving the drug for ADD."

9          The parties' dispute centers on whether the term should be limited to construe

10   "patient" as "child;" and on whether it should be further narrowed to apply to only those

11   children who had previously been receiving methylphenidate for treatment of ADD or

12   ADHD.[3]

13          Terms carry their plain and ordinary meaning unless "there is support for the

14   limitation in the words of the claim, the specification, or the prosecution history."  3M

15   Innovative Props. Co. v. Tredegar Corp., 725 F.3d 1315, 1333 (Fed. Cir. 2013).  Absent

16   disavowal, claims are not limited to the embodiments described in the specification.

17   Phillips, 415 F.3d at 1323.  The court should not "read limitations from the specification into

18   claims" and should not "redefine words."  Thorner v. Sony Comp. Enter. Am., 669 F.3d

19   1362, 1366 (Fed. Cir. 2012).

20          The court finds that ALZA's proposed construction is supported by the claim

21   language and the specification, and also finds no need to go beyond the plain meaning of

22   the words of the term.  Plaintiff asserts that the '129 patent does not expressly define the

23   term "patient" in either the specification or the claims, and that the "Detailed Description of

24   the Invention" identifies that the disclosure and claims are directed towards children, and

25   more specifically, school-age children having ADHD and who have previously received the

26
————————————————————

27          [3]  ALZA also indicated that the parties disputed whether the term applies to ADD only,
28   or whether it also applies to ADHD, but plaintiff did not address this issue in his responsive
brief.

**United States District Court**
For the Northern District of California

1   drug methylphenidate.  In particular, plaintiff claims that the '129 patent interchangeably

2   uses the terms "children with ADHD" and "patient" (citing '129 Patent, 6:66-7:13

3   (referencing methylphenidate therapy for treatment of ADHD in children)).

4         The court finds no support in the claims, however, to limit "patient" to children.

5   Moreover, the specification expressly refers to children and adults.  <u>See</u>, <u>e.g.</u>, '129 Patent,

6   6:53-61 (ADD and ADHC are "commonly diagnosed in children but can also occur in

7   adults").  Likewise, plaintiff's reliance on clinical studies related to children described in the

8   specification is unavailing because those studies merely describe specific, non-limiting

9   embodiments, and claims cannot be confined to those embodiments unless the patentee

10  "has demonstrated a clear intention to limit the claim scope using words or expressions of

11  manifest exclusion or restriction."  <u>Aria Diagnostics, Inc. v. Sequenom, Inc.</u>, 726 F.3d 1296,

12  1301 (Fed. Cir. 2013).

13        Finally neither the claims nor the specification state that the method claimed by the

14  invention must be limited to administration of MPH to children who have previously been

15  administered MPH.

16        2.    Term 2:  "**administering a pharmaceutically acceptable**

17              **composition comprising methylphenidate**" ('129 Patent, claims 1 and 2)

18        ALZA asserts that the term "administering" means "administering once-daily;" and

19  that "a pharmaceutically acceptable composition comprising methylphenidate" means "a

20  pharmaceutical composition that includes a dose of methylphenidate."  Plaintiff's proposed

21  construction is "one or more approximately equal doses of methylphenidate per day."

22        The parties' dispute centers on whether "administering" a "composition comprising

23  methylphenidate" refers to only once-a-day dosing, or whether it can include multiple doses

24  over the course of a day.  The parties do not disagree about the meaning of

25  "administering," apart from the question of the number of doses or number of times per day

26  a dose will be provided.  In addition, neither side proposes a construction of

27  "pharmaceutically acceptable composition comprising methylphenidate" that involves

28  anything other than the plain and ordinary meaning of the words.

United States District Court

For the Northern District of California

1    ALZA contends that the claim language, the specification, and the file history clearly

2  show that the claims are directed to a once-daily treatment.  ALZA also argues that

3  plaintiff's additional limitation of "equal doses" of MPH in separate administrations finds no

4  support in the claim language, the specification, or the prosecution history.

5    ALZA asserts that in claim 1, it is the "administering" step that "achieves" the recited

6  drug plasma profile, which occurs "over a time period of about 8 hours following said

7  administration."  '129 Patent 23:12-19.  ALZA contends that it is clear that "said

8  administration" refers to a single time point – and that it is only by reference to this single

9  time point that it is possible to determine "a time period of about 8 hours following said

10  administration," or conversely, that said administration" must refer to a single time point in

11  order to give meaning to the recited element "about 8 hours," and "administering" must thus

12  also refer to a single time point.

13    ALZA contends that the specification also conveys that the claimed invention is

14  directed to once-daily treatment.  ALZA notes that each of the exemplary embodiments of

15  the claimed dosage forms and methods provides the claimed ascending plasma profiles via

16  a single administration; and the specification discusses the multiple-dosing regimens of the

17  prior art only when contrasting them to the novel, once-a-day treatment methods.  See '129

18  Patent 7:14-34; see also id. 2:7-8, 40-3:13; 6:36-47.  In addition, ALZA asserts that the

19  specification clearly and explicitly distinguishes the claimed once-daily methods from

20  conventional multiple-daily administrations using IR MPH dosage forms.  See, e.g., id.

21  7:14-55.

22    In opposition, plaintiff asserts that when the indefinite article ("a" or "an") is used in a

23  claim term, it is presumed to mean "one or more," and that this is especially true when the

24  word "a" is used with the open-ended antecedent "comprising."  For this reason, he argues,

25  the use of the indefinite article "a" in the term "a pharmaceutically acceptable composition

26  comprising methylphenidate" compels the conclusion that the administration of "one or

27  more" pharmaceutical compositions may be used to achieve the claimed results, which he

28  claims supports his proposed construction of "one or more approximately equal doses of

1   methylphenidate per day."

2        Plaintiff notes that the patent Abstract also refers to "oral dosage forms that release

3   drug within the gastrointestinal tract at an ascending release rate over an extended time

4   period[,]" which "dosage forms may additionally comprise an immediate-release dose of

5   drug." '129 Patent, Abstract.  Plaintiff contends that this shows that something more than a

6   once-a-day dosage form is intended by the patent claimants.

7        Plaintiff asserts further that the body of the specification includes a number of

8   references that can be interpreted to refer to multiple dosing.  He cites to the statement in

9   the "Brief Summary" that "the present invention also pertains to improving drug therapy for

10  ADHD by eliminating the need for multiple daily doses of methylphenidate yet providing

11  therapeutic efficacy throughout the day that compares to the therapeutic efficacy provided

12  by multiple doses of immediate release methylphenidate." '129 Patent 5:58-62.  He

13  contends that the use of "also" shows that the patent is directed at more than single-daily-

14  dose administration, and that while one once-a-day treatment might be beneficial, it is not

15  the only disclosure contained in the patent.

16       Plaintiff also points to the statement in the "Detailed Description" that "[d]epending

17  on the dose of drug desired to be administered, one or more of the dosage forms may be

18  administered." '129 Patent 9:19-20.  He claims that this means that the inventions

19  contemplate the administration of "one or more" doses per day.  Plaintiff asserts further that

20  only one of the nine examples provided in the "Detailed Description" – Example 7 –

21  expressly describes the administration of a single dose as a means to practice the claimed

22  invention, and argues that the claims of the patent thus plainly cover more than is disclosed

23  in that single example.

24       The court finds that ALZA's proposed construction is supported by the claim

25  language and the specification, and that the term refers to administration at one point in

26  time.  It is true that the indefinite article ("a" or "an") "carries the meaning of 'one or more' in

27  open-ended claims containing the transitional phrase 'comprising.'" Baldwin Graphic Sys.,

28  Inc. v. Siebert, Inc., 512 F.3d 1338, 1342-43 (Fed. Cir. 2008) (quoting KCJ Corp. v. Kinetic

United States District Court

For the Northern District of California

1    Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000)).

2          That "a" or "an" can mean "one or more" is best described as a rule, rather
           than merely as a presumption or even a convention.  The exceptions to this
3          rule are extremely limited: a patentee must "evince[ ] a clear intent" to limit "a"
           or "an" to "one." . . . The subsequent use of definite articles "the" or "said" in a
4          claim to refer back to the same claim term does not change the general plural
           rule, but simply reinvokes that non-singular meaning.  An exception to the
5          general rule that "a" or "an" means more than one only arises where the
           language of the claims themselves, the specification, or the prosecution
6          history necessitate a departure from the rule.  See, e.g., Abtox Inc. v. Exitron
           Corp., 122 F.3d 1019 (Fed. Cir. 1997); Insituform Techs., Inc. v. Cat
7          Contracting, Inc., 99 F.3d 1098 (Fed. Cir. 1996).

8    Id.; see also SanDisk Corp. v. Kingston Tech. Co., Inc., 695 F3d 1348, 1360 (Fed. Cir.

9    2012); Norian Corp. v. Stryker Corp., 432 F.3d 1356, 1359 (Fed. Cir. 2005) (a "comprising"

10   claim may be limited to "one" rather than "more than one" when the specification or

11   prosecution history show that the term is used in its singular sense).

12          Here, however, plaintiff's argument regarding the presumption created by the use of

13   the indefinite article "a" is misdirected.  The use of "a" in front of the noun phrase

14   "pharmaceutically acceptable composition comprising methylphenidate" means that there

15   may be one or more "pharmaceutically acceptable compositions," the administration of

16   which comprises part of the method taught by claim 1 – not that one or more doses are

17   "administered."  The indefinite article "a" modifies "composition," not "dose."  The term

18   "dose" does not appear in the claim and does not equate to "composition," which is closer

19   in meaning (though not identical) to "dosage form."

20          The '129 patent, which is entitled "Methods and Devices for Providing Prolonged

21   Drug Therapy," refers throughout the specification to drug "dosage forms," and further,

22   distinguishes "conventional oral dosage forms" (also known as "immediate-release" dosage

23   forms), see, e.g., '129 Patent 2:7-10; from various "non-immediate-release delivery

24   systems" (or "sustained-release" oral dosage forms) previously known in the art, see e.g.,

25   id. 2:46-4:7; and distinguishes those forms from a sustained-release oral dosage form

26   adapted to provide "administration of a drug at a release rate that is substantially

27   ascending," see id. 4:10-6:14, of which "osmatic dosage forms . . . have been notably

28   successful at providing constant-release of drugs over extended time periods," id. 3:14-16.

United States District Court
For the Northern District of California

1    Similarly, the patent distinguishes "[b]i-layer oral osmotic dosage forms" previously

2   known in the art from the "bi-layer oral osmotic dosage forms" of the present invention.

3   See '129 Patent 10:53-13-53.  Further, each of the nine Examples in the Detailed

4   Description of the Invention describes a preferred embodiment of either a "bi-layer oral

5   osmotic dosage form" or a "tri-layer oral osmotic dosage form."  It is clear from this

6   discussion of "dosage forms" that what is meant is the form or composition of the drug

7   delivery system – not a "dose" or an amount of the drug that is to be ingested at a

8   particular time.  See also '129 Patent 2:8-11 ("immediate-release" oral-dosage form is one

9   in which "entire dose of drug is released from the dosage form within a very short period").

10    With regard to plaintiff's citation to the specification's use of "one or more dosage

11   forms," '129 Patent 9:15-20, this description supports ALZA's construction because it

12   explicitly refers to the "desired administration period" and to examples of administration

13   periods that are "every" 12 hours or 24 hours.  From the context of the specification, it is

14   clear that the reference to "one or more dosage forms" is a way to reference the amount of

15   drug to be given at one point in time, not to multiple doses to be administered throughout

16   the day.  Indeed, the specification refers to the multiple-dose regimen only in the context of

17   contrasting the prior art with the invention disclosed in the '129 patent – particularly in the

18   "Background of the Invention," in the "Brief Summary of the Invention," and in the "Detailed

19   Description of the Invention."  See id. 2:29-6:14; 6:66-7:22.

20    For example, the "Brief Summary of the Invention" explains that "oral

21   methylphenidate sustained release dosage forms that provide an ascending release rate of

22   a drug over an extended time period can be used to provide effective once-a-day therapy

23   for ADHD[;]" and that "the present invention also pertains to improving drug therapy for

24   ADHD by eliminating the need for multiple daily doses of methylphenidate yet providing

25   therapeutic efficacy throughout the day that compares to the therapeutic efficacy provided

26   by multiple doses of immediate release methylphenidate."  '129 Patent 5:54-63.

27    Similarly, the "Detailed Description of the Invention" explicitly discusses the

28   "therapeutic effectiveness of single doses," and teaches in Example 7 that "[a]n effective

United States District Court<br>For the Northern District of California

1  once-a-day therapy for ADHD provides many advantages and offers a significant

2  improvement in drug therapy by eliminating the need for multiple daily doses of

3  methylphenidate while providing continued therapeutic efficacy throughout the day."  '129

4  Patent 21:25-31; 22:22-27; see also id. 13:45-54.

5        The "Detailed Description" also emphasizes the advantages of the claimed invention

6  in the treatment of children with ADHD – explaining that single-dose administration is

7  preferable because of the problems inherent in dose administration throughout the school

8  day.  See, e.g., id. 7:14-8:16.  These teachings, along with the file history, indicate that the

9  claimed inventions concern once-daily administration.

10       3.    Terms 3 and 4:  "**[in a manner that achieves] a substantially ascending**

11             **methylphenidate plasma drug concentration over a period of about [x]**

12             **hours following said administration**" ('129 Patent, claims 1 and 2)

13       ALZA argues that "a substantially ascending methylphenidate plasma drug

14  concentration over a period of about [x] hours following said administration" should be

15  construed as "a profile in which the plasma concentration of methylphenidate generally

16  rises over approximately [x] hours, but may include a slight dip."  Plaintiff asserts that the

17  term should be construed as "an effect-time profile similar to three doses of immediate

18  release methylphenidate given approximately every 4 hours for approximately 12 hours per

19  day."

20       The basis of the parties' dispute is whether "substantially ascending" can include a

21  slight dip; and whether "substantially ascending methylphenidate plasma drug

22  concentration" refers to a measurement of plasma drug concentration or to an "effect-time

23  profile similar to" methylphenidate administered TID (three times a day).

24       The court finds no support in the claim language for adding the limitation "can

25  include a slight dip."  ALZA relies only on the explanation in Example 7 in the Detailed

26  Description of the Invention, and the accompanying illustration in Fig. 4.  Example 7

27  explains that the "[t]herapeutic effectiveness of single doses of tri-layer osmotic dosage

28  forms containing 14 mg of methylphenidate and additionally comprising an immediate-

13

United States District Court

For the Northern District of California

1   release drug overcoat containing 4 mg of methylphenidate was studied and compared to

2   multiple doses of immediate-release methylphenidate."  '129 Patent 21:25-30.

3       Example 7 explains further that this comparison is reflected in the graph in Fig. 4,

4   which shows that the plasma drug concentration following administration of the immediate-

5   release dose "rises fairly rapidly and then declines at a generally characteristic rate until the

6   next dose is administered[;]" and that the tri-layer osmotic dosage form "exhibits an initial

7   relatively rapid rise due largely to release of drug from the immediate-release drug

8   overcoat[,]" but subsequently, "the plasma drug concentration does not decline but

9   continues to substantially ascend (save for a slight 'dip' between t=5.5 hours and t=6.5

10  hours) through a time period of 9.5 hours."  '129 Patent 21:63-22:7; Fig. 4.  ALZA contends

11  that because Example 7 refers to "a slight dip," this term should be construed to include

12  that limitation.

13      The term "substantially ascending" communicates that the plasma drug

14  concentration mostly or generally ascends or rises.  "Substantially" is a descriptive term

15  commonly used in patent claims, where it can denote either language of approximation or

16  language of magnitude.  Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1333 (Fed.

17  Cir. 2010);  see also Wilson Sporting Goods Co. v. Hillerich & Bradsby Co., 442 F.3d 1322,

18  1329 (Fed. Cir. 2006) ("substantially" implies "approximate," rather than "perfect"); Deering

19  Precision Instruments, L.L.C. v. Vector Distrib. Sys., Inc., 347 F.3d 1314, 1322-23 (Fed.

20  Cir. 2003) ("substantially" can mean "significantly," "considerably," "largely," or

21  "essentially").

22      Here, the intrinsic evidence indicates that "substantially" is used in the claims of the

23  '129 patent as a term of approximation, to modify the word "ascending."  That is, in the

24  context of the claim language, the use of "substantially" indicates that the plasma

25  concentration generally rises, but that the rise is not necessarily uniform, and that some

26  variation is permitted.  See, e.g., Fig. 4 (showing that there can be a variation in the amount

27  of the drug in the plasma of a patient during the course of treatment).  To account for this

28  inherent variability, the plasma curve is described as "substantially" ascending.

14

United States District Court
For the Northern District of California

1    The court finds no basis to read the "slight dip" limitation into the claims of the '129

2    patent.  Nothing in the claims requires that the plasma drug concentration "dip" during the

3    course of its gradual ascent, and nothing in the specification or prosecution history includes

4    a contrary definition regarding "substantially ascending."  To the extent that "can include a

5    slight dip" simply reinforces the concept that the plasma drug concentration "substantially"

6    or "generally" or "approximately" rises, but may also briefly descend, it is superfluous.

7    Turning to the remaining dispute regarding the construction of this term – whether

8    "substantially ascending methylphenidate plasma drug concentration" refers to a

9    measurement of plasma drug concentration or to an "effect-time profile similar to"

10   methylphenidate administered TID – the court finds that ALZA's proposed construction is

11   consistent with the language of the claims and the specification.  On the other hand,

12   plaintiff's proposed construction is improper because it does not address the phrase

13   "plasma drug concentrations" and focuses on efficacy, rather than on plasma drug

14   concentrations; and also because it appears to involve an attempt to include TID dosing.

15   Claims 1 and 2 expressly refer to "plasma drug concentration," which is defined in

16   the specification.  See '129 Patent 1:44-51 ("plasma drug concentration" is "the

17   concentration of drug that is obtained within the blood or plasma, or other appropriate body

18   fluid or tissue of a patient following administration of the drug," and the term is "intended to

19   be inclusive of drug concentration measured in any appropriate body fluid or tissue"); see

20   also Example 7 (contrasting plasma drug concentration following administration of multiple

21   doses of immediate release drug ("standard regimen"), and following administration of the

22   "experimental regimen").

23   Because "plasma drug concentration" is defined in the specification, the construction

24   of the disputed term should reflect that definition.  However, plaintiff's proposed

25   construction – "effect-time profile" – includes no reference to the concentration of the drug

26   in plasma, which is an essential element of the claims.  Nor does it take into account the

27   "striking . . . "difference" between ALZA's claimed "substantially ascending" profile and the

28   "standard" TID regimen.  See '129 Patent 22:3-15.  Instead, he focuses on therapeutic

1    effect.

2          Plaintiff asserts that the term at issue covers both once-a-day dosing and the

3    administration of multiple doses over the course of a day.  He contends that the '129 patent

4    claims its earliest priority date to provisional application No. 60/030,514 ("the '514

5    provisional application"), filed on April 22, 1997.  Contained within the '514 provisional

6    application is language that plaintiff believes provides the easiest to understand

7    construction of the disputed claim term.

8          The '514 provisional application refers to "[a] delivery system" that is "provided by

9    the invention which releases the drug resulting in an ascending plasma methylphenidate

10   concentration time profile that . . . maintains the desired pharmacological effect;" and

11   provides "[a]s an example," a delivery system that "achieve[s] an effect-time profile similar

12   to the three doses of immediate release given every 4 hours for 12 hours every day, TID."

13   '514 Application, Example 6.

14         Thus, plaintiff asserts, in the application that provides the effective filing date of the

15   '129 patent, ALZA expressly discloses that the claimed method for treatment is designed to

16   achieve an effect time profile similar to TID dosing of methylprenidate.  He argues that the

17   dosage form provides efficacy "similar to" TID; and that the way in which the dosage form

18   accomplishes this efficacy ("substantially ascending" plasma concentration) "derive[s] its

19   meaning" from TID's "effect-time profile."

20         Plaintiff contends that his proposed construction is further bolstered by the '129

21   patent specification.  He points to the Detailed Description, which teaches that

22   "development of acute tolerance to methylphenidate has been proposed as an explanation

23   for the unsatisfactory decrease in therapeutic effectiveness that has been observed in

24   some cases," and that "an ascending-release regimen . . . was shown to maintain

25   therapeutic efficacy throughout the prolonged therapy period."  '129 Patent 8:17-30.  He

26   claims that this paragraph (8:17-30), when read in conjunction with the '514 application

27   cited above (referring to TID regimen of three equal doses given at periods spaced four

28   hours apart) shows that his proposed construction is correct.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    The '514 provisional application distinguishes between efficacy on the one hand, and

2    plasma drug concentrations on the other.  However, it is the latter (plasma drug

3    concentrations) to which the '129 patent is directed.  TID dosing involves three IR

4    administrations spaced hours apart, and results in "peaks and troughs" in plasma drug

5    concentrations.  By contrast, ALZA's invention concerns a once-daily dosage form resulting

6    in "substantially ascending plasma drug concentration" over time, which is clearly

7    distinguished in the patent from the prior art TID regimes.  See, e.g. '129 Patent, 22:3-15;

8    Example 7; Fig. 4.

9                                   '798 Patent

10    The '798 patent also contains two independent claims – claim 1 and claim 7.  Term 5

11    appears in claim 1 and claim 7.  Terms 6 and 7 appear in claim 1 only.  Term 8 appears in

12    claim 7 only.

13    Claim 1 of the '798 patent recites

14    **An oral tablet dosage form for the treatment of Attention Deficit
      Disorder or Attention Deficit Hyperactivity Disorder in a subject
15    comprising**:  **an immediate release portion comprising methylphenidate**
      or a pharmaceutically effective salt thereof; and a sustained release
16    portion comprising methylphenidate or a pharmaceutically effective salt thereof and a
      pharmaceutically acceptable carrier, wherein: said dosage form releases said
17    methylphenidate over a period comprising first, second, and third sequential
      one-hour time intervals, and **said sustained release portion releases more
18    of said methylphenidate during said second interval than during said
      first interval, and more of said methylphenidate during said third
19    interval than during said second interval.**

20    Claim 7 of the '798 patent recites

21    **An oral tablet dosage form for the treatment of Attention Deficit
      Disorder or Attention Deficit Hyperactivity Disorder in a subject
22    comprising**:  an immediate release coating comprising methylphenidate
      hydrochloride; and a sustained release portion comprising methylphenidate
23    hydrochloride and a pharmaceutically acceptable carrier, wherein: said
      dosage form provides release of said methylphenidate hydrochloride over a
24    period comprising first, second, third, and fourth sequential one-hour time
      intervals; said **sustained release portion releases more of said
25    methylphenidate hydrochloride during said second interval than during
      said first interval, more of said methylphenidate hydrochloride during
26    said third interval than during said second interval, and more of said
      methylphenidate hydrochloride during said fourth interval than during
27    said third interval**; the methylphenidate hydrochloride released during said
      first interval only includes methylphenidate hydrochloride released from said
28    immediate release coating.

United States District Court

For the Northern District of California

1
2
3

4.      Term 5:  "**An oral tablet dosage form for the treatment of Attention Deficit Disorder or Attention Deficit Hyperactivity Disorder in a subject comprising**" ('798 Patent, claims 1 and 7)

4   ALZA asserts that the plain and ordinary meaning of this should apply, and that it
5   should be construed as "a pharmaceutical composition in the form of a tablet that is
6   intended to be administered orally to an individual who is being treated for [ADD] and/or
7   [ADHD]."  Plaintiff's proposed construction is "methylphenidate in children who have been
8   receiving the drug for the treatment of ADD."

9   Similarly to term 1, above, the parties' dispute centers on whether the term should
10   be limited to construe "subject" as "child;" on whether it should be further narrowed to apply
11   to only those children who had previously been receiving methylphenidate for treatment of
12   ADD or ADHD.

13   The court finds that ALZA's proposed construction is supported by the claim
14   language and the specification, and finds no need to go beyond the plain meaning of the
15   language in the claim term.  The word "subject" appears twice in the preambles of
16   independent claims 1 and 7, and four times in the Detailed Description in Example 7.
17   Plaintiff asserts that just as the '129 patent does not provide a definition of "patient," the
18   '798 patent does not expressly define the term "subject" in either the specification or the
19   claims; but argues that the specification of the '129 patent (of which the '798 patent is a
20   continuation application) provides enabling disclosure only for children who had been
21   receiving the drug for the treatment of ADD.  Thus, plaintiff asserts, the '798 patent is also
22   enabled only for the same category of "subjects."

23   For the reasons stated above with regard to term 1, the court finds no support in the
24   claims to limit "subject" to children.  Plaintiff's main argument is based on the discussion in
25   the "Detailed Description" of the use of the claimed method in treating children.  But plaintiff
26   has taken one small part of the specification out of context.  The "Background of the
27   Invention" does not mention children at all; nor does the "Brief Summary of the Invention."
28   As for the "Detailed Description," that portion of the specification begins by

United States District Court

For the Northern District of California

1   discussing sustained release drug therapies in general, then states that "[t]here are clinical

2   situations . . . where the constant-release dosage form has unexpectedly exhibited

3   decreases in therapeutic effectiveness . . . ."  '129 Patent 6:37-52.  The specification goes

4   on to provide "[o]ne example" of such a clinical situation, which is the use of central

5   nervous system stimulant drugs "to treat various conditions and disorders including [ADD

6   and ADHD].  These disorders are commonly diagnosed in children but can also occur in

7   adults."  '129 Patent 6:53-61.

8          From there, the specification goes on to say that about 25 years ago,

9   "methylphenidate replaced amphetamine as the primary stimulant prescribed to treat

10  ADHD in children."  '129 Patent 6:63-65.  Only after that does the specification discuss the

11  need for symptom control during the school day, and the efficacy of the "substantially

12  ascending release rate" in situations where the patient may have a problem taking multiple

13  doses throughout the day.  Example 7, which is the main portion of the specification that

14  uses the word "subject," appears to equate "subject" with "study participant."  Example 7,

15  however, does not expressly state whether those participants were children or adults.  In

16  addition, neither the claims nor the specification state that the method claimed by the

17  invention must be limited to administration of MPH to children who have previously been

18  administered MPH.

19         Likewise, as stated above, plaintiff's reliance on clinical studies related to children

20  described in the specification is unavailing because those studies merely describe specific,

21  non-limiting embodiments, and claims cannot be confined to those embodiments unless the

22  patentee "has demonstrated a clear intention to limit the claim scope using words or

23  expressions of manifest exclusion or restriction."  Aria Diagnostics, 726 F.3d at 1301.

24         5.    Term 6:  "**an immediate release portion comprising**

25               **methylphenidate**" ('798 Patent, claim 1)

26         ALZA's proposed construction of this term is "a portion of the oral tablet dosage form

27  containing an amount of methylphenidate that is substantially completely released within a

28  time period of about 1 hour or less."  Plaintiff's proposed construction is "first oral dose of

1   instant release methylyphenidate."

2       The dispute between the parties centers on whether the patent claims multiple-daily-

3   dose administration, or single daily dose; and, relatedly, whether the "portion" disclosed in

4   this claim limitation refers to only "one part" of an "oral tablet dosage form."

5       ALZA contends that its proposed construction adopts the plain and ordinary meaning

6   of the words "portion" of "an oral tablet dosage form."  ALZA also argues that its

7   construction of "immediate release portion" is consistent with the use of that term in the

8   specification, as the specification defines "immediate release" to mean a drug that is

9   "substantially completely released within a time period of about 1 hour or less."  See '129

10  Patent 9:42-53.  The court finds that ALZA's proposed construction is supported by the

11  claim language and the specification, and also finds no need to go beyond the plain

12  meaning of the words in the term.

13      Plaintiff contends that "an immediate release portion" should be construed as

14  meaning a "first oral dose of instant release methylphenidate," which encompasses

15  "multiple doses" of "instant release" MPH administered at various time points (i.e., first

16  dose, second dose, and possibly third dose).  Plaintiff again cites to the '514 provisional

17  application, arguing that it describes ALZA's "sustained-release ascending profile" as of the

18  effective filing date of the '798 patent.  Plaintiff asserts that this "profile" is exhibited by

19  administering varying doses of methylphynidate every half hour, starting with "zero hour"

20  and continuing to 6.5 hours, to achieve a particular ascending sustained release profile.

21  Based on this, plaintiff argues that the claimed "immediate release portion compromising

22  methylphenidate" is the "first oral dose" of instant-release methylphenidate as indicated by

23  the steeply ascending first portion of the plasma concentration that rises through

24  approximately one hour.

25      Plaintiff also notes that claim 1 recites "an" oral dosage form – which means "one or

26  more."  For this reason, plaintiff asserts, the claimed portion of "one or more" oral tablet

27  dosage forms does not preclude an "immediate release portion" that comprises a "first oral

28  dose of instant release methylphenidate."  He argues that ALZA is improperly attempting to

United States District Court

For the Northern District of California

1    read in extra limitations to the claim term – namely, that the "portion" disclosed in this claim

2    limitation refers to only "one part of one oral tablet dosage."  Plaintiff contends that just as

3    the '129 patent, the '798 patent is not limited to one dosage, and thus, ALZA's construction,

4    while it might be relevant to one embodiment disclosed in the specification, would limit

5    claim 1 to that preferred embodiment.

6        Plaintiff's proposed construction is inconsistent with the language of claim 1, which

7    refers to a "portion" of an "oral tablet dosage form," and not to an entire dose.  The claims

8    make clear that they are directed to a "dosage form" having two components – an IR

9    portion, and an SR portion, "wherein said dosage form releases said methylphenidate over

10   a period comprising first, second, and third sequential one-hour time intervals . . . ."

11   See '798 Patent, claim 1.

12       In other words, claim 1 teaches an oral dosage form that comprises both "an

13   immediate release portion" and "a sustained release portion."  The patent does not claim

14   an "immediate release portion" that is one dose, and subsequent, separate doses.

15   Moreover, for the reasons explained above (in particular with regard to the construction of

16   term 2), the specification indicates that the patent is directed towards treating ADD/ADHD

17   by means of a once-a-day-dosage form, not with dosage forms administered multiple times

18   per day.  The ordinary meaning of this term is that what is claimed is an oral dosage in the

19   form of a tablet, which includes a portion that is initially substantially completely released,

20   and a portion that is released over an extended period of time (here, sequential one-hour

21   intervals), so as to delay or extend the action of the active ingredient.

22       By contrast, Example 1 of the '514 provisional application (part of the "Detailed

23   Disclosure") describes comparative clinical studies involving the administration of an

24   "immediate release" tablet and a "sustained release" nonascending tablet, followed by an

25   "ascending profile sustained release,"  with the administration and results illustrated in Figs.

26   1-5.  Example 1 illustrates a "sustained-release ascending profile" not via administration of

27   an oral dosage form with an IR portion and an SR portion, as required by claims 1 and 7 of

28   the '798 patent, but rather via administration of small amounts of IR MPH at 30-minute

United States District Court

For the Northern District of California

1  intervals (starting at 1.5 hours) to simulate drug release from an SR portion.  This example

2  includes no sustained release component at all, and is therefore not directed to the oral

3  tablet dosage form of claims 1 or 7.

4         Indeed, Example 1 involves no fewer than 12 administrations of IR MPH, starting at

5  zero hour, and continuing in varying amounts every half hour for the next six hours.  This

6  type of administration would run counter to the purpose of ALZA's claimed invention –

7  which provides "oral methylphenidate sustained release dosage forms [with] an ascending

8  release rate . . . over an extended time period . . . to provide effective once-a-day therapy

9  for ADHD."  '798 Patent, 5:54-57.

10        Moreover, it is improper to ignore the language of the claims and the specifications

11  of the patent, and to instead look only at an earlier patent application.  The Federal Circuit

12  has instructed that courts must first "look to the words of the claims themselves, both

13  asserted and nonasserted, to define the scope of the patented invention," and that second

14  to the claim language is the specification, which the court should review "to determine

15  whether the inventor has used any terms in a manner inconsistent with their ordinary

16  meaning."  <u>Vitronics</u>, 90 F.3d at 1582.

17        6.     Term 7:  "**said sustained release portion releases more of said**

18               **methylphenidate during said second interval than during said first**

19               **interval, and more of said methylphenidate during said third interval**

20               **than during said second interval**" ('798 Patent, claim 1)

21        Term 8:  "**said sustained release portion releases more of said**

22               **methylphenidate hydrochloride during said second interval than during**

23               **said first interval, more of said methylphenidate hydrochloride during**

24               **said third interval than during said second interval, and more of said**

25               **methylphenidate hydrochloride during said fourth interval than during**

26               **said third interval**" ('798 Patent, claim 7)

27        These two terms are similar.  The preamble is identical in claim 1 and claim 7 – "[a]n

28  oral tablet dosage form for the treatment of [ADD] or [ADHD] in a subject comprising . . . ."

United States District Court

For the Northern District of California

In claim 1, the dosage form comprises "an immediate release portion comprising methylphenidate" and "a sustained release portion comprising methylphenidate[.]"  In claim 7, the dosage form comprises "an immediate release coating comprising methylphenidate hydrocholoride" and "a sustained release portion comprising methylphenidate hydrochloride [plus a carrier].

In claim 1, the dosage form releases the methylyphenidate "over a period comprising first, second, and third sequential one-hour time intervals[,]" and in claim 7, the dosage form releases the methylphenidate "over a period comprising first, second, third, and fourth sequential one-hour time intervals."  In addition, claim 7 recites that drug released during the first time interval includes drug released from the IR coating.

This is followed in each instance by the portion of the claims to be construed, which is "said sustained release portion releases more of said methylphenidate . . . during said second interval than during said first interval [and] more of said methylphenidate . . . during said third interval than during said second interval . . ."

ALZA argues that the plain and ordinary meaning of the language in claims 1 and 7 should apply, to describe the amount of drug released during sequential time intervals. ALZA's proposed construction for the term in claim 1 is "the sustained release portion releases more of said methylphenidate during the second interval than during the first interval (if any), and more of said methylyphenidate during the third interval than during the second interval; and further, that the amount of methylphenidate 'said sustained release portion releases' is determined by an appropriate in vitro dissolution test."

ALZA's proposed construction of the term in claim 7 is "the sustained release portion releases more of said methylphenidate hydrochloride during the second interval than during the first interval (if any), and more of said methylyphenidate hydrochloride during the third interval than during the second interval, and more of said methylphenidate hydrochloride during the fourth interval than during the third interval; further, the amount of methylphenidate hydrochloride 'said sustained release portion releases' is determined by an appropriate in vitro dissolution test."

United States District Court

For the Northern District of California

1    Plaintiff's proposed construction for the term in both claim 1 and claim 7 is "release

2    rates corresponding to the plasma methylyphenidate concentrations that achieve an effect-

3    time profile similar to three doses of immediate release methylphenidate given

4    approximately every 4 hours for approximately 12 hours per day."

5    The dispute between the parties involves whether the construction should refer to

6    release of the SR portion or whether it should refer to the "effect-time profile" and/or to

7    therapeutic efficacy "similar" to that of TID dosing; whether the term must be construed to

8    require testing of the amount of drug released by an "appropriate in vitro dissolution test;"

9    and whether construction of these terms should differentiate between claim 1 and claim 7.

10    ALZA argues that claims 1 and 7 employ plain and ordinary language to describe the

11    amount of drug released during sequential time intervals, and that in contrast to its own

12    proposed construction, plaintiff's proposed construction fails to employ ordinary language.

13    ALZA argues that plaintiff's attempt to broadly define the claim scope as incorporating an

14    "effect-time profile" – "three doses of immediate release methylphenidate given

15    approximately every 4 hours for approximately 12 hours per day" as well as multiple-daily

16    dosing – is improper, because the claims of the '798 patent, like the claims of the '129

17    patent, include no terms relating to therapeutic efficacy.

18    ALZA contends that by proposing a construction reciting the "release rates

19    corresponding to" plasma drug levels "that achieve an effect-time profile similar to"

20    thrice-daily dosing, plaintiff advocates a construction that would encompass drug release

21    rates that produce a peak-and-trough plasma curve, i.e., drug release from three separate

22    immediate releases of drug, spaced approximately 4 hours apart.  ALZA argues that the

23    claim language does not describe separate immediate releases of MPH spaced hours

24    apart.  ALZA also contends that plaintiff's proposed construction would conflict with the

25    plain language of the claims reciting a "dosage form" that includes with both IR and SR

26    "portions," causing drug release "over a period comprising first, second, and third

27    sequential one-hour time intervals," with increasing amounts of drug released during each

28    subsequent time interval.  See '798 Patent, claim 1.

24

United States District Court
For the Northern District of California

1    With regard to the inclusion in its proposed construction of the clause "the amount of

2    methylphenidate 'said sustained release portion releases' is determined by an appropriate

3    in vitro dissolution test," ALZA argues that a skilled person would understand that drug

4    release is determined by dissolution testing.  ALZA asserts that this contrasts with the

5    claimed "plasma drug concentration" of the '129 patent, which it claims is a measurement

6    of in vivo MPH concentration in blood plasma.

7        In opposition, plaintiff argues that the intrinsic evidence from the '798 patent

8    supports his proposed construction.  He asserts that Example 1 of the '514 provisional

9    application demonstrates a sustained-release ascending profile achieved through multiple

10   dosings of instant release methylphenidate; and that Example 6 of the '514 application

11   shows that ALZA's goal was to achieve an effect-time profile similar to TID.  Plaintiff argues

12   that taken together, these two examples from the '514 application reflect ALZA's intent to

13   achieve "an effect-time profile similar to the three doses of immediate release given every 4

14   hours for 12 hours every day, TID."

15       Plaintiff argues that his proposed construction is further supported by the

16   prosecution history of the '798 patent.  On May 27, 2011, the USPTO issued an office

17   action rejecting the claims of Application No. 10/639,355 (the Application that issued as the

18   '798 Patent) under various grounds, including a nonstatutory obvious-type double patenting

19   rejection of the claims of the '798 patent over claims 1 and 2 of the '129 patent.  The

20   Examiner found that, although the claims were not identical, they were not patentably

21   distinct.

22       In responding to the office action, ALZA filed a terminal disclaimer to negate the

23   double patenting rejection.  Plaintiff asserts that ALZA did this instead of arguing that the

24   claims covered different subject matter (MPH plasma drug concentrations versus

25   ascending drug delivery), and argues that based on this, it is clear that the claims cover the

26   same subject matter, and it is therefore reasonable  to construe the claims of the '798

27   patent in terms of release rates that correspond to MPH concentrations.

28       The court finds that the first part of ALZA's proposed construction is supported by

25

United States District Court

For the Northern District of California

1  the claim language and the specification, and finds no need to go beyond the plain

2  meaning of the language when construing the term.  ALZA's proposed construction of the

3  "sustained release" portion of the claimed "oral tablet dosage form" tracks the plain and

4  ordinary language of claims 1 and 7, and describes the amount of MPH released during

5  sequential time intervals.  That is, a construction specifying the nature of the claimed

6  "release," as opposed to its therapeutic effect, gives expression to the claims' plain words.

7       Plaintiff's proposed construction, which refers to "release rates corresponding to . . .

8  concentrations that achieve an effect-time profile similar to" three doses of immediate

9  release methylphenidate given TID, improperly focuses on efficacy, rather than on the

10  amount of the drug released.  That is, in arguing that the proper construction is an

11  "effect-time profile similar" to three doses of IR MPH given every four hours, TID, plaintiff

12  has departed from the plain language of the claim – namely, the "release[]" of MPH – and

13  has instead focused on therapeutic efficacy "similar" to that of TID dosing.  The court finds

14  no support for this construction in the language of the claims or the specification, and

15  plaintiff has not identified any.

16       Similarly, plaintiff's argument that the word "treating" in the preamble of claims 1 and

17  7 compels an interpretation based on the therapeutic effect of MPH is without support.  The

18  claims concern "oral tablet dosage forms," and while they are intended for the treatment of

19  ADD/ADHD, the balance of claims 1 and 7 define the IR and SR components and release

20  rate characteristics of the dosage form, as opposed to any therapeutic effect.  '798 Patent,

21  claims 1 and 7.

22       As for plaintiff's citation to the '514 priority application, plaintiff's reliance on language

23  from Example 6 for the source of the "truest" construction of this term is misplaced, as the

24  claims and specification of the patent in question are the first and second sources for

25  guidance on claim construction.

26       As for plaintiff's citation to the terminal disclaimer filed in the '798 patent

27  examination, the fact that ALZA may have terminally disclaimed coverage beyond the term

28  of the '129 patent does not mean that the '798 and '129 patents cover the same subject

United States District Court

For the Northern District of California

1   matter, as plaintiff argues in his opposition.  A terminal disclaimer cannot overcome a

2   rejection based on claims to the same invention in separate, co-owned applications.  See

3   Manual of Patent Examining Procedure § 804.02.

4        Because a terminal disclaimer can overcome only an obviousness-type double

5   patenting rejection, see id., the claims in question are necessarily directed to different,

6   "patentably distinct" subject matter.  "[T]he filing of a terminal disclaimer simply serves the

7   statutory function of removing the rejection of double patenting, and raises neither

8   presumption nor estoppel on the merits of the rejection.  It is improper to convert this simple

9   expedient of 'obviation' into an admission or acquiescence or estoppel on the merits."

10  Quad Envtl. Techs. Corp. v. Union Sanitary Dist., 946 F.2d 870, 874 (Fed. Cir. 1991); see

11  also Ventana Med. Sys, Inc. v. Biogenex Labs., Inc., 473 F.3d 1173, 1184 n.4 (Fed. Cir.

12  2006) (filing of terminal disclaimer in response to obviousness-type double patenting

13  rejection of claims of patent application over claims of earlier-issued patent does not

14  represent admission by inventor equating all claims of patent application to claims of earlier

15  patent).

16       In addition, ALZA's proposed construction accounts for the differences in claim

17  language as between claim 1 and claim 7, including the number of time intervals recited

18  (three intervals in claim 1 versus four intervals in claim 7); the form of drug recited

19  (methylphenidate in claim 1 versus methylphenidate hydrochloride in claim 7); and drug

20  release during the first time interval (unlike claim 1, claim 7 recites that drug released

21  "during said first interval only includes" drug released from the IR coating).  Plaintiff, on the

22  other hand, proposes the same construction for the term in claim 1 and the similar (though

23  not identical) term in claim 7.  This failure to account for the differences between the two

24  claims violates the canon that when the patentee uses different language, different

25  meanings are intended.  See Tandon Corp. v. ITC, 831 F.2d 1017, 1023 (Fed. Cir. 1987).

26       With regard to the second part of ALZA's proposed construction, there is support in

27  the specification for determining a "release rate" by "an appropriate in-vitro dissolution test."

28   The Background of the Invention states that "drug release rates for oral dosage forms"  are

27

1   "typically measured is an in vitro rate of dissolution."  '129 Patent 2:3-6.  The Detailed

2   Description teaches that "[d]rug release rates are calculated under in vitro dosage form

3   dissolution testing conditions known in the art," and that as used in the patent, "a drug

4   release rate obtained at a specified time, 'following administration' refers to the in vitro drug

5   release rate obtained at the specified time following implementation of an appropriate

6   dissolution test."  Id. 9:23-29.  Further, the amount of drug released in all nine Examples in

7   the Detailed Description was measured using a particular type of in vitro dissolution test.

8   See id. 9:29-36.

9        Nevertheless, the court finds no support for this limitation in the language of the

10  claims.  While this limitation is not inconsistent with patent specification, it does not provide

11  any meaning in the context of the preamble of claims 1 and 7 of the '798 patent, namely,

12  "[a]n oral tablet dosage form for the treatment of [ADD] or [ADHD]."

13  C.      Motion to Strike Evidence

14       ALZA also filed a separate motion seeking an order under Federal Rules of

15  Evidence 26 and 37 and Patent Local Rule 4-3, striking evidence filed in support of

16  plaintiff's responsive claim construction brief.  The evidence ALZA seeks to have stricken is

17  Exhibits C, E-I, K, L-R, V, Z, AA, and BB of the Declaration of Gerald Dodson; portions of

18  the Declaration of Dr. James M. Swanson; and the portions of plaintiff's responsive claim

19  construction brief that rely on those references. The court finds that the motion must be

20  DENIED.

21       As an initial matter, some portions of ALZA's motion can be viewed simply as

22  objections to evidence submitted by plaintiff with his responsive claim construction brief.

23  However, there is no provision in the Patent Local Rules for filing such an objection.  Under

24  the Civil Local Rules (which apply in patent cases to the extent they do not conflict with the

25  Patent Local Rules), "[a]ny evidentiary or procedural objections to the motion must be

26  contained within the brief or memorandum" unless the objection is to reply evidence.  Civ.

27  L.R. 7-3.

28       It is true that a motion to strike an expert declaration may be appropriate where the

United States District Court

For the Northern District of California

1   sponsoring party failed to disclose the expert's identity or his opinions prior to filing the

2   brief.  See, e.g., <u>Nordic Naturals v. J.R. Carlson Labs, Inc.</u>, 2008 WL 2357312 at *11 (N.D.

3   Cal. June 6, 2008) (granting a motion to strike the declaration of an expert who had not

4   been previously disclosed).  Here, however, the court finds no basis for striking any of the

5   evidence submitted by plaintiff, primarily because the court found it unnecessary to rely on

6   any extrinsic evidence in construing the disputed terms.

7   **CONCLUSION**

8   In accordance with the foregoing, the court construes the disputed terms as follows:

9   1.   "a method for treating Attention-Deficit Disorder or Attention Deficit

10  Hyperactivity Disorder in a patient" means **"a method for treating ADD or ADHD in an**

11  **individual."**

12  2.   "administering a pharmaceutically acceptable composition comprising

13  methylphenidate" means **"administering a pharmaceutically acceptable composition**

14  **comprising methylphenidate once-daily."**

15  3.   "[in a manner that achieves] as substantially ascending methylphenidate

16  plasma drug concentration over a period of about [x] hours following said administration"

17  means **"a profile in which the plasma concentration of methylphenidate generally**

18  **rises over approximately [x] hours."**

19  4.   "an oral tablet dosage form for the treatment of Attention Deficit Disorder or

20  Attention Deficit Hyperactivity Disorder in a subject comprising" means **"a pharmaceutical**

21  **composition in the form of a tablet that is intended to be administered orally to an**

22  **individual who is being treated for ADD and/or ADHD."**

23  5.   "an immediate release portion comprising methylphenidate" means **"a**

24  **portion of the oral tablet dosage form containing an amount of methylphenidate that**

25  **is substantially completely released within a time period of about 1 hour or less."**

26  6.   "said sustained release portion releases more of said methylphenidate

27  hydrochloride during said second interval than during said first interval, and more of said

28  methylphenidate during said third interval than during said second interval" means **"the**

1   **sustained release portion releases more of said methylphenidate during the second**

2   **interval than during the first interval (if any), and more of said methylphenidate**

3   **during the third interval than during the second interval."**

4        7.    "said sustained release portion releases more of said methylphenidate

5   hydrochloride during said second interval than during said first interval, more of said

6   methylphenidate hydrochloride during said third interval than during said second interval,

7   and more of said methylphenidate hydrochloride during said fourth interval than during

8   said third interval" means **"the sustained release portion releases more of said**

9   **methylphenidate hydrochloride during the second interval than during the first**

10  **interval (if any), and more of said methylyphenidate hydrochloride during the third**

11  **interval than during the second interval, and more of said methylphenidate**

12  **hydrochloride during the fourth interval than during the third interval."**

13       Pursuant to the court's Standing Order for Patent Cases, a case management

14  conference will be held on May 22, 2014, at 2:00 p.m.  The parties may stipulate to change

15  this date for any other Thursday on which the court is available in May or June 2014.

16

17  **IT IS SO ORDERED.**

18  Dated:  April 25, 2014

19  _____
    PHYLLIS J. HAMILTON
    United States District Judge

20

21

22

23

24

25

26

27

28